UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

-FILED-

JAN 19 2017

At _____ M
ROBERT N. TRGOVICH, Clerk
U.S. DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CAUSE NO. 2:15-CR-... |
| | ) | |
| v. | ) | 18 U.S.C. § 1962(d) |
| | ) | 18 U.S.C. § 1959(a)(1) |
| ANTON LAMONT JAMES, Jr. a/k/a | ) | 18 U.S.C. § 924(c) and (j) |
| "Ghost"; | ) | 18 U.S.C. § 2 |
| JAVIER CASTILLO; | ) | 18 U.S.C. § 1591(a)(1) |
| ALEXIS SANTOS; | ) | 21 U.S.C. § 846 |
| JOSEPH UVALLE a/k/a "Little Foot"; | ) | 18 U.S.C. § 2421 |
| ALDON PEREZ a/k/a "Spooky"; | ) | 18 U.S.C. § 1951(a)(3) |
| JULIAN ROBERT REBELES a/k/a "King | ) | 18 U.S.C. § 922(d)(1) |
| Porky"; | ) | 18 U.S.C. § 1791(a)(2) |
| REYNALDO ROBLES a/k/a "Sneaky"; | ) | 18 U.S.C. § 1791(b)(4) |
| NICHOLAS BAEZ a/k/a "Cali"; | ) | 21 U.S.C. § 841(a)(1) |
| EFREN DELANGEL a/k/a "Payoso"; | ) | 18 U.S.C. § 1591(b)(1) |
| MARK ANTHONY TONEY a/k/a | ) | |
| "Slim"; | ) | |
| WILLIAM DENNIS SALAZAR; | ) | |
| DARRICK ROBERT VALLODOLID; | ) | |
| ROBERT NIETO a/k/a "Cowboy"; | ) | |
| PETER SALINAS a/k/a "Pudge"; | ) | |
| JEREMIAH SHANE FARMER; | ) | |
| LAZARO FRANCISCO DELGADO- | ) | |
| GONZALEZ, Jr. a/k/a "Pollo Loco"; | ) | |
| TIMOTHY MAURICE DIAZ a/k/a | ) | |
| "Slice"; | ) | |
| SEAN MICHAEL PENA a/k/a "Big | ) | |
| Body"; | ) | |
| MARQUIS SEAN MEDELLIN a/k/a | ) | |

"Kilo";                                                )
DAVID ULMENSTINE a/k/a "Silent";     )
JORGE ESQUEDA a/k/a "Silent";          )
JUAN ALCARAZ a/k/a "Silent";            )
MIGUEL ANGEL MARINES a/k/a          )
"Egg";                                                  )
RAFAEL CANCEL;                                  )
KASH LEE KELLY; and                          )
EDUARDO IVEL a/k/a "Little Smiley"     )

## THIRD SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES**:

### COUNT 1
### (Conspiracy to Participate in Racketeering Activity)

### Introduction

1.     At various times relevant to this Third Superseding Indictment,

the following defendants, and others known and unknown, were members of

the "Almighty LATIN KING Nation" (hereinafter the "LATIN KINGS"), a

criminal organization whose members and associates engaged in acts of

violence, including murder, attempted murder, robbery, aggravated battery,

aggravated assault, intimidation, witness retaliation and witness tampering,

sex trafficking and narcotics distribution, and which operated in the

Northwest Indiana area, the Northern District of Indiana, Hammond

Division, and elsewhere: **ANTON LAMONT JAMES, Jr. a/k/a "Ghost,"**

JAVIER CASTILLO, ALEXIS SANTOS, JOSEPH UVALLE a/k/a "Little Foot," ALDON PEREZ a/k/a "Spooky," JULIAN ROBERT REBELES a/k/a "King Porky," REYNALDO ROBLES a/k/a "Sneaky," NICHOLAS BAEZ a/k/a "Cali," EFREN DELANGEL a/k/a "Payoso," MARK ANTHONY TONEY a/k/a "Slim," WILLIAM DENNIS SALAZAR, DARRICK ROBERT VALLODOLID, ROBERT NIETO a/k/a "Cowboy," PETER SALINAS a/k/a "Pudge," JEREMIAH SHANE FARMER, LAZARO FRANCISCO DELGADO-GONZALEZ, Jr. a/k/a "Pollo Loco," TIMOTHY MAURICE DIAZ a/k/a "Slice," SEAN MICHAEL PENA a/k/a "Big Body," MARQUIS SEAN MEDELLIN a/k/a "KILO," DAVID ULMENSTINE a/k/a "Silent," JORGE ESQUEDA a/k/a "Silent," JUAN ALCARAZ a/k/a "Silent," MIGUEL ANGEL MARINES a/k/a "Egg, " RAFAEL CANCEL and EDUARDO IVEL a/k/a "Little Smiley."

## General Background and Structure of the Enterprise

2. The structure of the LATIN KINGS included, but was not limited to, the following:

a. The LATIN KINGS were a violent street gang with thousands of members across the United States and overseas.

b. The traditional power centers of the LATIN KINGS, and members of

the gang's national leadership structure, were predominately located in the Chicago (known as "KMC" or the "Motherland") and New York (referred to as the "Bloodline") metropolitan areas.

c. The LATIN KINGS had a detailed and uniform organizational structure, which is outlined—along with various prayers, codes of behavior, and rituals—in a written "manifesto" widely distributed to members throughout the country.

d. The Chicago area LATIN KINGS are divided by the North and South Sides of Chicago, each led by the "Corona," the highest ranking LATIN KING member. Both Coronas would report to the overall LATIN KING leader. The LATIN KINGS were further organized by geographic locations into "Regions." Generally, each Region had a rank structure that included a "Regional Officer" or "Regional Inca," one or more "Regional Enforcers," and a "Regional Treasurer." The Regional Officer was the highest authority within the Region. Regional Enforcers served to support the Regional Officer, and enforce discipline and adherence by gang members to established LATIN KING rules and by-laws. The Regional Officers reported to an individual known as the "Supreme Regional Officer," who was sometimes known as the "Supreme Regional Inca."

e. The Supreme Regional Officer was the second highest ranking LATIN KING on the South Side of Chicago. In turn, the Supreme Regional Officer reported to the "Corona," the highest ranking LATIN KING gang member on the South side of the Chicago area.

f. Each Region was comprised of "Branches," "Chapters," or "Sections," hereinafter referred to as "Chapters." Each chapter was typically named after a street or streets that ran through the chapter. Each chapter had its own rank structure, a leader or "Inca," a second in command or "Cacique," an "Enforcer," a "Treasurer" and "Crown Council" members, all of whom were in charge of the non-ranking gang members or "Soldiers" within the chapter.

g. There were several Regions of LATIN KINGS operating throughout the Chicago, Suburban and Northwest Indiana areas. One such Region was known as the Southeast Chicago Region, which included parts of Chicago's South and East sides, and Chicago South Suburban. At various times during the course of the conspiracy, the Southeast Chicago Region included the Hammond, Gary, East Chicago and Lake Station, Indiana areas. From approximately March 2015 on, the Indiana chapters made up their own region, referred to as the Indiana Region, and were not part of the Southeast Chicago Region.

h. At various times during the course of the conspiracy, the Indiana chapters of the LATIN KINGS included but were not limited to the Waco, Hessville, Gostlin Street and 148th Street Chapters in Hammond, the 142nd, 143rd, 145th and 138th Street Chapters in East Chicago, the 24th Avenue Black Oak Chapter in Gary, and the Lake Station Chapter.

i. LATIN KINGS leaders had the authority within the gang to order "missions" and mete out punishment. A "mission" was an assignment given to a subordinate LATIN KING member that would serve a purpose for the LATIN KING nation. The "missions" could range from a leader ordering a "B.O.S." (beat down on sight), meaning the assault of a rival gang member or a LATIN KING member who had committed a violation of the LATIN KING rules, to a "green light" or "K.O.S." (kill on sight), meaning the murder of a rival gang member or of a LATIN KING member who may have committed an egregious violation of the gang's rules. Failure to perform a "mission" resulted in the assigned member being in violation of the rules. Punishment for failing to complete the "mission" could range anywhere from a beating to death.

j. Members of the LATIN KINGS greeted each other, and showed their membership in the gang, using a set of hand-gang signs, each intended to

evoke the shape of a crown. In addition, LATIN KINGS often greeted one another, demonstrated their allegiance to the gang, or simply announced their arrival or presence in a particular area by exclaiming "ADR" or "Amor De Rey," which means "King's Love" in Spanish. Other phrases unique to the LATIN KING lexicon included "360," "ALKN," "ALKQN," "Crown," "Lion," "Lion Tribe," "Motherland," "KMC," "Kingism," and "Bloodline." The LATIN KINGS employed a robust symbology as well, often using depictions of five-pointed crowns, lions, and Inca or Aztec-inspired artwork to demonstrate their affiliation. Members often had tattoos incorporating one or more of the aforementioned phrases or symbols, the crown and the lion being the most prominent. The gang also incorporated these phrases and symbols into graffiti, which they used to mark their territory or announce their presence in a particular area. The colors associated with the LATIN KINGS were black and gold, and members of the LATIN KINGS often demonstrated their affiliation with the LATIN KINGS by wearing clothing containing the colors black and gold or incorporating some of the gang's other symbols or phrases.

3. The LATIN KINGS are affiliated with the "People Nation" of gangs. Rival street gangs of the Indiana Chapters of the LATIN KINGS have included but are not limited to the Latin Counts, the Gangster Disciples, the

Two Six Nation, the Latin Dragons, the Aztec Souls and the Imperial Gangsters.

## The Racketeering Enterprise

4.     The LATIN KINGS, including its leadership, membership, and associates, constitutes an enterprise as defined in 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members, prospects and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

## Purposes of the Enterprise

5.  The purposes of the enterprise included, but were not limited to, the following:

a.  Enriching the leaders, members, and associates of the enterprise through, among other things, the illegal trafficking of controlled substances.

b.  Preserving and protecting the power, territory, operations, and proceeds of the enterprise through the use of threats, intimidation, violence and destruction including, but not limited to, acts of murder, attempted murder, assault with a dangerous weapon and other acts of violence.

c. Promoting and enhancing the enterprise and its members' and associates' activities.

d. Keeping victims in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and violence. The leaders, members, and associates of the enterprise undertook all steps necessary to prevent the detection of their criminal activities, and sought to prevent and resolve the imposition of any criminal liabilities upon their leaders, members, and associates, by the use of murder, violence, and intimidation directed against witnesses, victims, and others. As part of this practice, the enterprise enforced what it referred to as an "SOS" or shoot on sight order, or also known as "KOS" or, kill on sight, against LATIN KINGS members who were suspected of having cooperated with law enforcement.

e. Providing support to gang members who were charged with, or incarcerated for, gang-related activities.

### The Racketeering Conspiracy

6. Beginning on a date unknown to the Grand Jury, but at least as of in or about 2003, and continuing through on or about the date of this Third Superseding Indictment, in the Northern District of Indiana and elsewhere, the defendants,

**ANTON LAMONT JAMES, Jr. a/k/a "Ghost,"**
**JAVIER CASTILLO,**
**ALEXIS SANTOS,**
**JOSEPH UVALLE a/k/a "Little Foot,"**
**ALDON PEREZ a/k/a "Spooky,"**
**JULIAN ROBERT REBELES a/k/a "King Porky,"**
**REYNALDO ROBLES a/k/a "Sneaky,"**
**NICHOLAS BAEZ a/k/a "Cali,"**
**EFREN DELANGEL a/k/a "Payoso,"**
**MARK ANTHONY TONEY a/k/a "Slim,"**
**WILLIAM DENNIS SALAZAR,**
**DARRICK ROBERT VALLODOLID,**
**ROBERT NIETO a/k/a "Cowboy,"**
**PETER SALINAS a/k/a "Pudge,"**
**JEREMIAH SHANE FARMER**
**LAZARO FRANCISCO DELGADO-GONZALEZ, Jr. a/k/a "Pollo**
**Loco,"**
**TIMOTHY MAURICE DIAZ a/k/a "Slice,"**
**SEAN MICHAEL PENA a/k/a "Big Body,"**
**MARQUIS SEAN MEDELLIN a/k/a "Kilo,"**
**DAVID ULMENSTINE a/k/a "Silent,"**
**JORGE ESQUEDA a/k/a "Silent,"**
**JUAN ALCARAZ a/k/a "Silent,"**
**MIGUEL ANGEL MARINES a/k/a "Egg,"**
**RAFAEL CANCEL,**
**and**
**EDUARDO IVEL a/k/a "Little Smiley,"**

each being a person employed by and associated with the LATIN KINGS, an

enterprise engaged in, and the activities of which affected, interstate and

foreign commerce, together with Claudio Tino Martinez a/k/a "CK," Anthony

Manuel Flores, Jason Christerpher Brown a/k/a "Midnight," Rodolfo Carlos

Flores a/k/a "Big Head," Francisco Gamez a/k/a "Frank Nitti," Pierre Java

Forest a/k/a "Joker," Keith Trevor Manuel a/k/a "Smiley," Jose Antonio

Sanchez a/k/a "Sly," Mario Resendiz a/k/a "Spank," "Rio," Alberto Tirado a/k/a

"B Murda," Raymond Fazekas a/k/a "Pirate," Antonio Gamino a/k/a "Stacks,"

John Joseph Castillo a/k/a "Tio," Bruce Hendry a/k/a "Casper," Luis Rivera

a/k/a "Loony," Francisco Gamez a/k/a "Vino," Bruce Hendry a/k/a "Casper"

and others known and unknown to the Grand Jury, did knowingly and

intentionally conspire to conduct and participate, directly and indirectly, in

the conduct of the affairs of the enterprise through a pattern of racketeering

activity, as defined in Sections 1961(1) and (5) of Title 18, United States

Code, consisting of multiple acts involving murder in violation of Indiana

Code 35-42-1-1, 35-41-2-4, 35-41-5-1, 35-41-5-2(a)(1), and 35-41-5-2(a)(2),

multiple acts involving robbery in violation of Indiana Code 35-42-5-1, 35-41-

2-4, 35-41-5-1, 35-41-5-2(a)(1), and 35-41-5-2(a)(2), multiple acts indictable

under 18 United States Code Section 1951 (Hobbs Act Robbery), multiple acts

indictable under 18 United States Code Section 1591 (Sex Trafficking by

Force, Fraud, or Coercion) and multiple acts involving narcotics trafficking in

violation of 21 United States Code Sections 841(a)(1) (distribution and

possession with the intent to distribute a controlled substance) and Section

846 (conspiracy to distribute and possess with the intent to distribute a

controlled substance). It was part of this conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

## Means and Methods of the Enterprise

7. Each member of the enterprise agreed to facilitate a scheme that included the operation and management of the enterprise by a conspirator. Members of the enterprise and their associates operated and conducted their affairs through a series of laws and policies, some of which were codified in a constitution and a series of laws.

8. The members of the enterprise and their associates attended regular meetings at which they discussed, planned, and otherwise engaged in criminal activity, including murder, attempted murder, robberies, narcotics distribution, and obstruction of justice.

9. Members of the enterprise and their associates initiated new members through the practice of causing them to endure physical assaults conducted by members of the enterprise at various gang-related gatherings.

10. To enforce discipline and the rules of the enterprise, members of the enterprise and their associates engaged in a system of "violations," in which members of the enterprise attempted to murder, conspired to murder, and

physically beat and threatened those members of the enterprise who violated rules, questioned authority, or posed a threat to the leaders or purposes of the enterprise.

11. Members of the enterprise and their associates employed and used gang-related terminology, symbols, gestures, and color schemes.

12. To perpetuate the enterprise and maintain and extend their power, members of the enterprise and their associates committed illegal acts, including murder, attempted murder, aggravated battery, intimidation, and aggravated assault against individuals who posed a threat to the enterprise or jeopardized its operations, including rival gang members and witnesses to the illegal activities of the enterprise. Pursuant to gang policy, members of the enterprise and their associates were required to participate in such acts, received standing orders to shoot rival gang members, and were instructed to retaliate for gang-related attacks upon the members and associates of the enterprise.

13. Members of the enterprise and their associates were required to "post up" and patrol in their neighborhood. This entailed standing guard in their neighborhood and shooting at any rival gang member they saw and also at any individual in their neighborhood who was selling drugs without their

permission. A member or associate of the enterprise would be violated if they did not "post up" in their LATIN KING neighborhood.

14.     Members of the enterprise and their associates obtained, used, carried, possessed, brandished, and discharged firearms in connection with the enterprise's illegal activities, including, but not limited to, murder, robbery, and the illegal trafficking of controlled substances.

15.  Members of the enterprise and their associates managed the procurement, transfer, use, concealment, and disposal of firearms and dangerous weapons within the enterprise to protect gang-related territory, personnel, and operations, and to deter, eliminate, and retaliate against competitors and other rival criminal organizations and persons.

16.     Members of the enterprise and their associates used multiple cellular telephones, disposable cellular telephones, and social media to communicate with one another concerning and during the commission of the enterprise's illegal activities.

17.  Members of the enterprise and their associates earned money for their members and regularly financed their activities through funds obtained in the illegal trafficking of controlled substances, including the distribution and possession with intent to distribute marijuana, synthetic marijuana and

cocaine. An integral part of this drug trafficking entailed committing armed robberies and burglarizing the stash houses of rival drug dealers.

18. Members of the enterprise and their associates earned money for their members and regularly financed their activities through funds obtained through the commission of burglaries of residences and armed robbery of citizens in the Northern District of Indiana.

19. Members of the enterprise and their associates operated and conducted their affairs, in part, through a financial system in which the leadership of the LATIN KINGS and others possessed, controlled, and otherwise maintained a monetary stash on behalf of the enterprise. As part of this practice, members of the enterprise and their associates paid requisite weekly or bi-weekly dues into the pot, which, in turn, the enterprise used to bail gang members out of jail, to help pay for the defense attorneys of gang members who had been charged with crimes, to send to commissary accounts of incarcerated gang members, and to purchase and sell firearms and controlled substances. At times, the members of the enterprise and their associates paid money into the pot by selling narcotics supplied by members of the gang.

20. Members of the enterprise and their associates hid,

misrepresented, concealed and caused to be misrepresented, concealed, and hidden, the objectives of acts done in furtherance of the conspiracy, and used coded language and other means to avoid detection and apprehension by law enforcement authorities.

21. Members of the enterprise recruited and used juveniles to commit acts for the benefit of the enterprise.

22. In order to join the LATIN KINGS prospective members or "futures" are given a "violation," of a certain number of minutes, which entails the prospective member standing in the middle of a circle and getting beaten by multiple members of the LATIN KINGS. While a "future" is attempting to join the gang his conduct is observed by the members of the LATIN KINGS. While a "future" is attempting to join the gang, he is considered a part of the LATIN KING family and entitled to the full protection of the enterprise. The "future" is also subject to the rules and orders of the enterprise.

23. When a LATIN KING goes to prison, they must report to any LATIN KING and identify themselves as a LATIN KING, and which hood or set they come from. The LATIN KING who has just arrived in prison must turn over a set of his legal documents to the LATIN KINGS in prison, to

prove to them that he did not cooperate with law enforcement. Once it is determined that the newly arrived LATIN KING did not cooperate in his case, he is "put on count" in the prison. LATIN KINGS, while in prison, must attend meetings once a week, on average. They must also pay dues to the "caja" or box, which go towards buying hygiene products for newly arrived LATIN KINGS. Each cell block or section of the prison has an Inca, Casique and an Enforcer. Members have to be on watch, or post up, while in the recreation yard. Each LATIN KING must also be on watch and protect fellow LATIN KINGS in the dormitory, and while a fellow LATIN KING is in the shower. During time periods that the LATIN KINGS are "at war" with another gang in the prison, the soldiers in the LATIN KINGS must take turns standing guard at the Inca's cell through the night.

## Overt Acts

24. In furtherance of the conspiracy and to achieve the objects thereof, the defendants and others performed or caused to be performed the following overt acts, among others, in the Northern District of Indiana and elsewhere:

a. On September 17, 2003, Francisco Gamez a/k/a "Frank Nitti" shot at an individual and unintentionally hit another individual in the head.

b. On September 9, 2007, **RAFAEL CANCEL** possessed a stolen

firearm.

c.  On May 20, 2008, **DARRICK ROBERT VALLODOLID** possessed a firearm.

d.  On November 7, 2009, **ALDON PEREZ** possessed a firearm and fled from the police.

e.  On December 21, 2009, Jason Christerpher Brown shot an individual, who he believed to be a rival gang member.

f.  On September 21, 2010, **REYNALDO ROBLES** possessed a firearm.

g.  On July 7, 2011, **JAVIER CASTILLO** possessed a firearm.

h.  On July 18, 2011, **REYNALDO ROBLES**, who was acting at the direction of **ALDON PEREZ**, shot and killed Travis Nash, who he believed to be a rival gang member.

i.  From approximately 2011 to approximately 2013, **MARK ANTHONY TONEY** served as the Inca of the 148th Street LATIN KINGS in Hammond, Indiana.

j.  On July 15, 2012, **JOSEPH UVALLE** burglarized a residence.

k.  On October 10, 2012, **JULIAN ROBERT REBELES**, Claudio Tino Martinez and two other individuals broke into a residence in Hammond,

Indiana and demanded cocaine from the residents. During the course of this home invasion robbery, Francisco Gamez a/k/a "Frank Nitti" and another individual drove around the area serving as lookouts, while they listened to police scanners. During the course of this home invasion robbery, Claudio Tino Martinez pistol whipped one of the victims. This robbery netted only one ounce of cocaine, which was divided at the residence of Francisco Gamez a/k/a "Frank Nitti."

l. On December 17, 2012, **MARK ANTHONY TONEY** possessed a firearm.

m. On December 23, 2012, **JULIAN ROBERT REBELES** shot an individual who he believed to be a rival gang member.

n. From 2013 to 2014, **ROBERT NIETO** served as a regional officer for Indiana while Indiana was still under the Southeast Chicago Region of the LATIN KINGS. In this capacity, **NIETO** collected dues from John Joseph Castillo, the Inca of the Lake Station LATIN KINGS, as well as from the Incas of other Indiana chapters to pay to the Southeast Chicago Region.

o. On January 5, 2013, **EFREN DELANGEL** started a fire at a residence on Durbin Street, Gary, Indiana because the owner owed a drug debt to the LATIN KINGS.

p. On January 10, 2013, **JULIAN ROBERT REBELES** possessed a firearm.

q. On February 4, 2013, **ANTON LAMONT JAMES, Jr.** robbed a pizza delivery man and struck him multiple times with a blunt object.

r. On March 22, 2013, Bruce Hendry and another member of the LATIN KINGS started a fire at a residence on Sherman Street in Gary, Indiana. This act was committed at the direction of **ROBERT NIETO**, who told Hendry that the resident of the house owed members of the LATIN KINGS a drug debt.

s. On August 16, 2013, Jose Antonio Sanchez and Francisco Gamez a/k/a "Vino" shot multiple times at two individuals who they believed to be rival gang members.

t. In or about 2013, John Joseph Castillo, Jose Antonio Sanchez and other members of the LATIN KINGS traveled to South Bend, Indiana and Kokomo, Indiana in an effort to coordinate with the LATIN KINGS in those areas.

u. From 2013-2014, John Joseph Castillo served as the Regional Enforcer for Indiana, while Indiana was still under the Southeast Chicago Region. In this position, Castillo collected dues from the various chapters in

Indiana and turned them over to the leadership of the Southeast Chicago Region.

v. In approximately February 2014, Francisco Gamez a/k/a "Frank Nitti" and other members of the LATIN KINGS did an armed robbery of an auto sales business in Hammond, Indiana, in an attempt to steal drugs from the owner of the business.

w. On February 25, 2014, **EDUARDO IVEL** possessed a firearm.

x. On July 30, 2014, **ALDON PEREZ** and Pierre Java Forest each possessed a firearm, and **ALDON PEREZ** brandished the firearm that he was holding by pointing it in an aggressive manner at two individuals known to the grand jury.

y. On July 30, 2014 **JOSEPH UVALLE** provided Luis Rivera a shotgun and instructed him to patrol a neighborhood in East Chicago, Indiana. **EDUARDO IVEL**, who possessed a pistol, patrolled the neighborhood with Rivera.

z. In or about the summer of 2014, Francisco Gamez a/k/a "Frank Nitti" reported to **ALDON PEREZ** that members of the Aztec Souls street gang had shot at his house in Hammond, Indiana, and Gamez wanted the LATIN KINGS to shoot some members of the Aztec Souls in retaliation.

Jason Christerpher Brown, Claudio Tino Martinez and **ALDON PEREZ** then drove to Gamez's residence, where he gave them two .45 caliber pistols. Martinez, Brown and **PEREZ** then drove to the residence of an Aztec Souls gang member in Hammond and Martinez and **PEREZ** got out of the vehicles and shot at some members of the Aztec Souls who were in the backyard of the residence.

aa. On August 14, 2014, Keith Trevor Manuel and **JOSEPH UVALLE** demanded that members of the LATIN KINGS take action against Estrella's Bar in Hammond, Indiana, as the owner of Estrella's Bar was allowing rival gang members to patronize the bar. **JOSEPH UVALLE** drove **NICHOLAS BAEZ** and Antonio Gamino to the bar and handed **BAEZ** a firearm. **BAEZ** shot into the bar, striking and killing Raudel Contreras, while Gamino served as a lookout.

bb. On October 28, 2014, **ANTON LAMONT JAMES, Jr.** shot Martin Hurtado, Sr., killing him. **JAMES** had believed that he was firing at Hurtado, Sr.'s son, who he believed to be a member of the Latin Counts street gang.

cc. On multiple unknown dates in 2014, **ANTON LAMONT JAMES, Jr.** had Claudio Tino Martinez ask Francisco Gamez a/k/a "Frank Nitti" on

his behalf whether **JAMES** would "get his crown" (become a full member of the LATIN KINGS) for his murder of Martin Hurtado, Sr. **JAMES** was told that he would not "get his crown" for this homicide, as he had accidentally shot an innocent bystander.

dd.  On December 1, 2014, Claudio Tino Martinez possessed five firearms, ammunition and marijuana.  One of these firearms was the murder weapon from the homicide of Hurtado, Sr. **ANTON LAMONT JAMES, Jr.** was present in Martinez's residence when the firearms were recovered.

ee.  On January 23, 2015, **Marquis Medellin** informed Jason Christerpher Brown and Anthony Manuel Flores that Miguel Payan had just left a particular location in Hammond, Indiana.  Brown and Flores then drove to this location and shot Payan.

ff.  Between on or about March 2015 and June 2015, **JOSEPH UVALLE** earned money by causing women to engage in commercial sex acts. **UVALLE** would then pay the gang dues for his chapter of the LATIN KINGS with the proceeds of these commercial sex acts.

gg.  Between on or about March 2015 and June 2015 **JOSEPH UVALLE** offered the prostitution services of an individual known to the grand jury to members of the LATIN KINGS at discounted rates.

hh.  In or about March 2015, John Joseph Castillo asked permission of the leaders of the LATIN KING Southeast Chicago Region for Indiana to become its own region.  This request was granted, and John Joseph Castillo became the Regional Inca for the Indiana region.  Upon becoming Regional Inca for the Indiana region, John Joseph Castillo appointed regional officers to serve under him.  One such officer was **WILLIAM DENNIS SALAZAR**, who was appointed by Castillo to be the Enforcer for the Indiana region.

ii.  On multiple occasions in 2015, John Joseph Castillo ordered **WILLIAM DENNIS SALAZAR** to have various members of the LATIN KINGS beaten, or "violated," for breaking the rules of the LATIN KINGS.

jj.  On May 18, 2015, **ANTON LAMONT JAMES, Jr.** possessed a firearm and marijuana.

kk.  On June 4, 2015, **JAVIER CASTILLO, ALEXIS SANTOS,** Rodolfo Carlos Flores and Francisco Gamez a/k/a "Frank Nitti" beat an individual known to the grand jury, who they believed to be a rival gang member, with a baseball bat.

ll.  On June 11, 2015, **JOSEPH UVALLE** instructed an individual known to the grand jury to go with him to the Cabela's store in Hammond, Indiana to purchase a firearm for him, as he was at that point in time a

convicted felon and unable to legally purchase a firearm. This individual intentionally made an error while filling out the documents to purchase the firearm, and the sale was denied.

mm. On June 29, 2015, **REYNALDO ROBLES** and Sean Yancey picked up a LATIN KING from a location in East Chicago and drove him to St. Margaret's Hospital in Hammond, Indiana, because he had just been shot in a shootout with a rival gang member. Prior to arriving at the hospital, **ROBLES** and Yancey drove the LATIN KING to another LATIN KING member's house to drop off the firearm that he had just used.

nn. In or about the spring of 2015, Pierre Java Forest and Mario Resendiz pointed firearms at members of the Black P Stone gang in a threatening manner, and stole two firearms from them.

oo. In 2015, **JULIAN ROBERT REBELES** was detained in Lake County Jail, in Crown Point, Indiana. While in jail he informed fellow members of the LATIN KINGS that he wanted a member of the LATIN KINGS who he believed to be cooperating to be killed.

pp. On July 26, 2015, Bruce Hendry and other members of the LATIN KINGS shot at, burned and then burglarized a residence on West 23rd Avenue in Gary, Indiana that they believed to be occupied by a member of the

rival Imperial Gangsters gang.

qq. On August 21, 2015, Luis Rene Rivera and George Carlos Gutierrez shot an individual who they believed to be a rival gang member.

rr. In or about August 2015, a letter was delivered to a member of the LATIN KINGS in Lake County Jail, in Crown Point, Indiana, instructing him that a member of the LATIN KINGS known to the grand jury has "a wide mouth I want him hit a knife will be sent to you by my guy on trustee this weekend handle or get handled." The letter was signed **JULIAN ROBERT REBELES**.

ss. In 2015, **ANTON LAMONT JAMES, Jr.** told fellow members of the LATIN KINGS in Lake County Jail that he wanted Claudio Tino Martinez "handled" (killed) because he thought that he was cooperating with law enforcement regarding the murder of Martin Hurtado, Sr.

tt. On September 28, 2015, Bruce Hendry and other members of the LATIN KINGS set fire to the residence of a rival Imperial Gangster gang member on Colfax Street, Gary, Indiana.

uu. On November 13, 2015, Francisco Gamez a/k/a "Frank Nitti" possessed marijuana, a digital scale, and $11,045 in U.S. currency.

vv. On January 9, 2016, while incarcerated in Lake County Jail in

Crown Point, Indiana, **ALEXIS SANTOS** possessed a homemade knife, also known as a "shank."

ww. On January 14, 2016, while incarcerated in Lake County Jail in Crown Point, Indiana, **ALEXIS SANTOS** possessed a homemade knife, also known as a "shank."

xx. In January and February 2016, **JULIAN ROBERT REBELES** made arrangements with Ellisa Salazar and Lake County Jail corrections officer David Victor to purchase a cellular telephone and smuggle it in to **REBELES** while he was incarcerated in the Lake County Jail. **REBELES** arranged to pay Victor $1,000 to smuggle this contraband in to the Lake County Jail, in Crown Point, Indiana.

## Notice of Enhanced Sentencing

25.     On or about July 18, 2011, in the Northern District of Indiana,

**REYNALDO ROBLES** and **ALDON PEREZ** knowingly and intentionally

killed Travis Nash in violation of Indiana Penal Code Sections 35-42-1-1 and

35-41-2-4, under the aggravating circumstance of intentionally killing the

victim while committing or attempting to commit Criminal Gang Activity, as

defined in Indiana Penal Code Section 35-45-9-3, in violation of Indiana

Penal Code Section 35-50-2-9(b)(I) (1997).

26.     On or about August 14, 2014, in the Northern District of Indiana,

**JOSEPH UVALLE** and **NICHOLAS BAEZ** knowingly and intentionally

killed Raudel Contreras, in violation of Indiana Penal Code Sections 35-42-1-

1 and 35-41-2-4, under the aggravating circumstance of intentionally killing

the victim while committing or attempting to commit Criminal Gang Activity,

as defined in Indiana Penal Code Section 35-45-9-3, in violation of Indiana

Penal Code Section 35-50-2-9(b)(I) (1997).

27.     On or about October 28, 2014, in the Northern District of

Indiana, **ANTON LAMONT JAMES, Jr.** knowingly and intentionally killed

Martin Hurtado, Sr. in violation of Indiana Penal Code Sections 35-42-1-1

and 35-41-2-4, under the aggravating circumstance of intentionally killing

the victim while committing or attempting to commit Criminal Gang Activity, as defined in Indiana Penal Code Section 35-45-9-3, in violation of Indiana Penal Code Section 35-50-2-9(b)(I) (1997).

28. From in or about 2003, and continuing through on or about the date of this Third Superseding Indictment, in the Northern District of Indiana and elsewhere, **ANTON LAMONT JAMES, Jr. a/k/a "Ghost," JAVIER CASTILLO, ALEXIS SANTOS, JOSEPH UVALLE a/k/a "Little Foot," ALDON PEREZ a/k/a "Spooky," JULIAN ROBERT REBELES a/k/a "King Porky," REYNALDO ROBLES a/k/a "Sneaky," NICHOLAS BAEZ a/k/a "Cali," EFREN DELANGEL a/k/a "Payoso," MARK ANTHONY TONEY a/k/a "Slim," WILLIAM DENNIS SALAZAR, DARRICK ROBERT VALLODOLID, ROBERT NIETO a/k/a "Cowboy," PETER SALINAS a/k/a "Pudge," JEREMIAH SHANE FARMER, LAZARO FRANCISCO DELGADO-GONZALEZ, Jr. a/k/a "Pollo Loco," TIMOTHY MAURICE DIAZ a/k/a "Slice," SEAN MICHAEL PENA a/k/a "Big Body," MARQUIS SEAN MEDELLIN a/k/a "KILO," DAVID ULMENSTINE a/k/a "Silent," JORGE ESQUEDA a/k/a "Silent," JUAN ALCARAZ a/k/a "Silent," MIGUEL ANGEL MARINES a/k/a "Egg, " RAFAEL CANCEL** and **EDUARDO IVEL a/k/a "Little Smiley"**

knowingly and intentionally conspired to possess with intent to distribute and distribute five (5) kilograms or more of cocaine and one hundred (100) kilograms or more of marijuana, in violation of Title 21 United States Code Section 846.

All in violation of Title 18, United States Code, Section 1962(d).

THE GRAND JURY FURTHER CHARGES:

## COUNT 2
## (Conspiracy to Possess with Intent to Distribute and Distribute Cocaine and Marijuana)

Beginning on a date unknown to the Grand Jury, but at least as of in or about 2003, and continuing through on or about the date of this Third Superseding Indictment, in the Northern District of Indiana and elsewhere, the defendants,

ANTON LAMONT JAMES, Jr. a/k/a "Ghost,"
JAVIER CASTILLO,
ALEXIS SANTOS,
JOSEPH UVALLE a/k/a "Little Foot,"
ALDON PEREZ a/k/a "Spooky,"
JULIAN ROBERT REBELES a/k/a "King Porky,"
REYNALDO ROBLES a/k/a "Sneaky,"
NICHOLAS BAEZ a/k/a "Cali,"
EFREN DELANGEL a/k/a "Payoso,"
MARK ANTHONY TONEY a/k/a "Slim,"
WILLIAM DENNIS SALAZAR,
DARRICK ROBERT VALLODOLID,
ROBERT NIETO a/k/a "Cowboy,"
PETER SALINAS a/k/a "Pudge,"
JEREMIAH SHANE FARMER
LAZARO FRANCISCO DELGADO-GONZALEZ, Jr. a/k/a "Pollo Loco,"
TIMOTHY MAURICE DIAZ a/k/a "Slice,"
SEAN MICHAEL PENA a/k/a "Big Body,"
MARQUIS SEAN MEDELLIN a/k/a "KILO,"
DAVID ULMENSTINE a/k/a "Silent,"
JORGE ESQUEDA a/k/a "Silent,"
JUAN ALCARAZ a/k/a "Silent,"
MIGUEL ANGEL MARINES a/k/a "Egg,"

**RAFAEL CANCEL,**
**KASH LEE KELLY**
**and**
**EDUARDO IVEL a/k/a "Little Smiley,"**

defendants herein, did knowingly and intentionally combine, conspire, confederate and agree one with another together with Claudio Tino Martinez a/k/a "CK," Anthony Manuel Flores, Jason Christerpher Brown a/k/a "Midnight," Rodolfo Carlos Flores a/k/a "Big Head," Francisco Gamez a/k/a "Frank Nitti," Pierre Java Forest a/k/a "Joker," Keith Trevor Manuel a/k/a "Smiley," Jose Antonio Sanchez a/k/a "Sly," Mario Resendiz a/k/a "Spank," "Rio," Alberto Tirado a/k/a "B Murda," Raymond Fazekas a/k/a "Pirate," Sean Yancey a/k/a "Demon," Antonio Gamino a/k/a "Stacks," John Joseph Castillo a/k/a "Tio," Luis Rivera a/k/a "Loony," Francisco Gamez a/k/a "Vino," Bruce Hendry a/k/a "Casper" and others known and unknown to the Grand Jury, to commit the following offense against the United States: to knowingly and intentionally possess with intent to distribute and distribute one hundred (100) kilograms or more of a mixture and substance containing a detectable amount of marijuana, a schedule I controlled substance and five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, a schedule II controlled substance;

All in violation of Title 21, United States Code, Section 846.

**THE GRAND JURY FURTHER CHARGES**:

## COUNT 3
## (Murder in Aid of Racketeering Activity)

1. At all times relevant to this Third Superseding Indictment the LATIN KINGS, as more fully described in paragraphs 1 through 5 of Count 1 of this Third Superseding Indictment, which are re-alleged and incorporated by reference as though fully set forth herein, constituted an enterprise as defined in 18 U.S.C. § 1959(b)(2), namely the LATIN KINGS, that is, a group of individuals associated in fact which is engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

2. At all times relevant to this Third Superseding Indictment, the above-described enterprise, through its members and associates, engaged in racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1), namely, narcotics trafficking in violation of 21 U.S.C. §§ 841 and 846, and acts involving murder in violation of Indiana Penal Code, Section 35-42-1-1, 35-41-2-4, and 35-41-5-1.

3. On or about October 28, 2014, in the Northern District of Indiana,

**ANTON LAMONT JAMES, Jr. a/k/a "Ghost,"**

defendant herein, for the purpose of gaining entrance to and maintaining and increasing position in the LATIN KINGS, an enterprise engaged in racketeering activity, did intentionally and knowingly murder Martin Hurtado, Sr., in violation of Indiana Penal Code, Section 35-42-1-1 and 35-41-2-4.

All in violation of Title 18, United States Code, Section 1959(a)(1).

**THE GRAND JURY FURTHER CHARGES**:

## COUNT 4
## (Murder Resulting From the Use and Carrying of Firearm During and in Relation to a Crime of Violence)

1.      Paragraphs 1 through 5 of Count 1 of this Third Superseding Indictment, which are re-alleged and incorporated by reference as though set forth fully herein.

2.  On or about October 28, 2014, in the Northern District of Indiana,

**ANTON LAMONT JAMES, Jr. a/k/a "Ghost,"**

defendant herein, did knowingly carry, use, and discharge a firearm during and in relation to a crime of violence, that is, murder in aid of racketeering activity, as set forth in Count 3 of this Third Superseding Indictment, and that in the course of these violations, defendant caused the death of Martin Hurtado, Sr. through the use of a firearm, such killing being murder as defined in Title 18, United States Code, Section 1111, in that it was an unlawful, willful, deliberate, malicious and premeditated killing committed with malice aforethought.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A) and (j).

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 5
## (Sex Trafficking by Fraud and Coercion)

Between on or about March 1, 2015, and on or about June 24, 2015, in the Northern District of Indiana and elsewhere, the defendant,

**JOSEPH UVALLE a/k/a "Little Foot,"**

in or affecting interstate commerce, did knowingly recruit, entice, transport, provide and maintain by any means K.N., knowing that fraud and coercion would be used to cause K.N. to engage in a commercial sex act.

All in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1).

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 6
### (Transportation for Prostitution)

Between on or about March 1, 2015, and on or about June 24, 2015, in the Northern District of Indiana and elsewhere, the defendant,

**JOSEPH UVALLE a/k/a "Little Foot,"**

did knowingly transport and cause to be transported K.N. from the State of Illinois to the State of Indiana with intent that K.N. engage in prostitution.

All in violation of Title 18, United States Code, Sections 2 and 2421.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 7
### (Sex Trafficking by Fraud and Coercion)

Between on or about March 1, 2015, and on or about June 24, 2015, in the Northern District of Indiana and elsewhere, the defendant,

**JOSEPH UVALLE a/k/a "Little Foot,"**

in or affecting interstate commerce, did knowingly recruit, entice, provide and maintain by any means T.F., knowing that fraud and coercion would be used to cause T.F. to engage in a commercial sex act.

All in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1).

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 8
### (Transportation for Prostitution)

Between on or about March 1, 2015, and on or about April 30, 2015, in the Northern District of Indiana and elsewhere, the defendant,

**JOSEPH UVALLE a/k/a "Little Foot,"**

did knowingly transport and cause to be transported T.F. from the State of Indiana to the State of Illinois with intent that T.F. engage in prostitution.

All in violation of Title 18, United States Code, Sections 2 and 2421.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 9
## (Attempted Introduction of Contraband Into a Federal Correctional Facility)

On or about January 27, 2016 to on or about February 3, 2016 within the Northern District of Indiana,

**JULIAN ROBERT REBELES a/k/a "King Porky,"**

defendant herein, an inmate of Lake County Jail, a prison, institution, and facility in which persons are held in custody by direction of and pursuant to a contract and agreement with the Attorney General, attempted to possess a prohibited object, to wit a phone or other device used by a user of commercial mobile service in connection with such service.

All in violation of Title 18, United States Code, Sections 1791(a)(2) and (b)(4).

## FORFEITURE ALLEGATIONS
## RICO FORFEITURE

1.     The allegations contained in Count One of this Third Superseding Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c). Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count One of this Third Superseding Indictment.

2.     The defendants,

**ANTON LAMONT JAMES, Jr. a/k/a "Ghost,"
JAVIER CASTILLO,
ALEXIS SANTOS,
JOSEPH UVALLE a/k/a "Little Foot,"
ALDON PEREZ a/k/a "Spooky,"
JULIAN ROBERT REBELES a/k/a "King Porky,"
REYNALDO ROBLES a/k/a "Sneaky,"
NICHOLAS BAEZ a/k/a "Cali,"
EFREN DELANGEL a/k/a "Payoso,"
MARK ANTHONY TONEY a/k/a "Slim,"
WILLIAM DENNIS SALAZAR,
DARRICK ROBERT VALLODOLID,
ROBERT NIETO a/k/a "Cowboy,"
PETER SALINAS a/k/a "Pudge,"
JEREMIAH SHANE FARMER
LAZARO FRANCISCO DELGADO-GONZALEZ, Jr. a/k/a "Pollo
Loco,"
TIMOTHY MAURICE DIAZ a/k/a "Slice,"**

**SEAN MICHAEL PENA a/k/a "Big Body,"**
**MARQUIS SEAN MEDELLIN a/k/a "KILO,"**
**DAVID ULMENSTINE a/k/a "Silent,"**
**JORGE ESQUEDA a/k/a "Silent,"**
**JUAN ALCARAZ a/k/a "Silent,"**
**MIGUEL ANGEL MARINES a/k/a "Egg,"**
**RAFAEL CANCEL,**
**and**
**EDUARDO IVEL a/k/a "Little Smiley,"**

i.      have acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

ii.      have an interest in, security of, claims against, and property and contractual rights which afford a source of influence over, the enterprise named and described herein which the defendants established, operated, controlled, conducted, and participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2);

iii.      have property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States

Code, Section 1963(a)(3).

3.     The interest of the defendants subject to forfeiture to the United
States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2),
and (a)(3), include but are not limited to:

   a.     $11,045.00;

   b.     One (1) Taurus, .45 caliber pistol, bearing serial number
          NCS98752;

   c.     One (1) Para-Ordnance, .45 caliber pistol, bearing serial
          number HM8474;

   d.     One (1) Taurus, nine millimeter pistol, bearing serial
          number TTF27423;

   e.     One (1) Hi Point rifle, bearing serial number R15717;

   f.     One (1) Smith & Wesson, .40 caliber pistol, bearing serial
          number HEY2051;

   g.     One (1) Canik 55, nine millimeter pistol, bearing serial
          number 13A107076;

   h.     Ammunition, including .40 caliber ammunition and nine
          millimeter ammunition; and

   i.     One (1) Kahr firearm, bearing serial number EE6019;

4.     The above-named defendants, and each of them, are jointly and severally liable for the forfeiture obligations as alleged above.

All pursuant to Title 18, United States Code, Section 1963.

## NARCOTICS TRAFFICKING FORFEITURE

1.     The allegations of Count Two of the Third Superseding Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America pursuant to the provisions of Title 21, United States Code, Section 853. Upon conviction of the offense alleged in Count Two of the Third Superseding Indictment, defendants herein,

**ANTON LAMONT JAMES, Jr. a/k/a "Ghost,"
JAVIER CASTILLO,
ALEXIS SANTOS,
JOSEPH UVALLE a/k/a "Little Foot,"
ALDON PEREZ a/k/a "Spooky,"
JULIAN ROBERT REBELES a/k/a "King Porky,"
REYNALDO ROBLES a/k/a "Sneaky,"
NICHOLAS BAEZ a/k/a "Cali,"
EFREN DELANGEL a/k/a "Payoso,"
MARK ANTHONY TONEY a/k/a "Slim,"
WILLIAM DENNIS SALAZAR,
DARRICK ROBERT VALLODOLID,
ROBERT NIETO a/k/a "Cowboy,"
PETER SALINAS a/k/a "Pudge,"**

**JEREMIAH SHANE FARMER**
**LAZARO FRANCISCO DELGADO-GONZALEZ, Jr. a/k/a "Pollo Loco,"**
**TIMOTHY MAURICE DIAZ a/k/a "Slice,"**
**SEAN MICHAEL PENA a/k/a "Big Body,"**
**MARQUIS SEAN MEDELLIN a/k/a "KILO,"**
**DAVID ULMENSTINE a/k/a "Silent,"**
**JORGE ESQUEDA a/k/a "Silent,"**
**JUAN ALCARAZ a/k/a "Silent,"**
**MIGUEL ANGEL MARINES a/k/a "Egg,"**
**RAFAEL CANCEL,**
**KASH LEE KELLY**
**and**
**EDUARDO IVEL a/k/a "Little Smiley,"**

defendants herein, shall forfeit to the United States of America pursuant to Title 21, United States Code, Section 853, any and all property used and intended to be used, in any manner or part to commit or to facilitate the commission of such offense, and any and all property constituting or derived from proceeds the defendant obtained directly or indirectly as a result of said violations, including but not limited to:

    a.    $11,045.00 in U.S. Currency;

    b.    One (1) Taurus, .45 caliber pistol, bearing serial number NCS98752;

    c.    One (1) Para-Ordnance, .45 caliber pistol, bearing serial number HM8474;

    d.    One (1) Taurus, nine millimeter pistol, bearing serial

number TTF27423;

e.       One (1) Hi Point rifle, bearing serial number R15717;

f.       One (1) Smith & Wesson, .40 caliber pistol, bearing serial number HEY2051;

g.       One (1) Canik 55, nine millimeter pistol, bearing serial number 13A107076;

h.       Ammunition, including .40 caliber ammunition and nine millimeter ammunition; and

i.       One (1) Kahr firearm, bearing serial number EE6019.

2.       If any of the property described above, as a result of any act or omission of any of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

## SEX TRAFFICKING AND PROSTITUTION FORFEITURE

1.    The allegations of Counts Five through Eight of the Third Superseding Indictment are re-alleged and fully incorporated herein for the purpose of alleging forfeitures to the United States of America pursuant to the provisions of Title 18, United States Code, Sections 1594(d) and 2253. Upon conviction of one or more of the offenses alleged in Counts Five through Eight of the Third Superseding Indictment, **JOSEPH UVALLE a/k/a "Little Foot"** shall forfeit to the United States of America all property, real and personal, used or intended to be used to commit or facilitate the commission of such offenses, and any property which constitutes or is derived from proceeds traceable to such offenses.

A TRUE BILL:


/s/ Foreperson
FOREPERSON



DAVID CAPP
UNITED STATES ATTORNEY


By:    /s/ David J. Nozick
       David J. Nozick
       Assistant United States Attorney

By:     /s/ David J. Nozick   for
        Abizer Zanzi
        Assistant United States Attorney


By:     /s/ David J. Nozick   for
        Dean R. Lanter
        Assistant United States Attorney